I'm Mike Farrell and I represent Robert Lamar Whitfield. With the panel's leave I'd request to reserve three minutes for rebuttal. I also have three colleagues who will also address this argument. The issues that I'd like to address are those of our motion for dismissal on outrageous government conduct, two the court's denial of- Hold on, hold on. Your clock's wrong. How many minutes did you- Eight minutes, right? Eight, please. Eight. His clock should show eight minutes. Somebody reserve three for rebuttal. Oh, that's right, that's right, okay. I'm sorry, I apologize. No, the eight does not include- excuse me, the eight doesn't include that three. Right, right. Okay, go ahead. The issues that I want to address are the trial court's- You said outrageous conduct, but isn't our case law clear that that needs to be made before trial? Yes, your honor. There is a rule 12 waiver issue, but there is a good cause exception to that. The rule's explicit though, isn't it? The rule is explicit that it should be pre-trial, but that there is a good cause exception. And our contention is that good cause exception is ultimately this is an emerging issue nationally, and ultimately the issue was raised- According to the memo that Judge Santiago, I assume this accurately summarizes it, between the time of the charges being brought and the time of the trial, Judge Castillo in Chicago, in a similar kind of argument, allowed discovery on that issue, and apparently some folks here leaned on to that, but there's no reason why the issue could not have been the same thing that Judge Castillo did. Your honor, I think that the temporal facts are that the motion for discovery in an evidentiary hearing were three days after the opinion by Judge Castillo in Chicago. But your very term, emerging issue, it's not as if it had never been out there before in any form of discussion. This wasn't a lightning strike that suddenly occurred after the pre-trial stage of this case, right? Judge, the decision permitting discovery, the filing of the motion and the order, the first of its kind permitting discovery was within days of my raising the issue. That was a district court's decision, which obviously resulted from somebody thinking to ask for it. I agree, Judge. It was contrary to the plain text of Rule 12. Completely agree, Judge. But we contend that it's an important enough issue that good cause should be found to address the merits. At some point, ultimately, as Jay Madison said, ultimately there has to be checks and balances, and although extensive discretion should be given to prosecutors in bringing cases, that there must be a limit. And in this case, and I was... Could good cause ever be the use of a significant amount of government resources toward bringing about prosecutions of this kind? I mean, would that be... That is a serious question aggregating how many of these sorts of investigations are carried out. Could that be an extraordinary circumstance? Yes, Your Honor. I believe that, frankly, what we marshaled, and I'm going to the second issue, but they're intertwined. The outrageousness of the government conduct inescapably involves not only the creation of the crime, the inducement, and those six factors, which is now a totality of circumstances test, which was outlined in black, but ultimately, I believe, as an overriding element of the outrageousness of the conduct of the totality of circumstances, which I could go through those six, is the racial discriminatory targeting of poor black men in the inner city. I marshaled evidence... Mr. Fell, what's unusual, though, about this case, because we have seen a few Stash House cases, what's unusual about this one is that they weren't even targeting your client. They were after Quasi, and your client volunteers. So doesn't that put him in a tough spot trying to argue that they were out to get him, and you've got sentencing, entrapment, manipulation, all that? Judge, he's an eager volunteer here when they're specifically asking for his help in getting somebody else. Well, obviously, my comment is going to address sentencing, entrapment, Judge, but let me address that for a second. First of all, the government, essentially, the second problem of the totality of circumstances is individual suspicion. Although your Honor said that the government essentially spoke out of both sides of their mouth, they said that ultimately my client simply volunteered but was not targeted, but then in fact presented evidence that they in fact had evidence of individual suspicion. When in fact, the only conviction my client had in his 31 years was of disorderly conduct. He was a criminal history zero. He was broke, he didn't have a car, he lived with his mothers. These were all facts that came out, I mean, ultimately, his bragging indicates that he bought a house for his mother? Simple check would have been she rented, that he paid for college for his siblings, $25,000 a piece. Simple investigation would have led the government to realize that that wasn't true. In the investigation itself, my client always had to get rides. He represents that he's broke. So, they're kind of speaking out of both sides of their mouth. They want the jury to know that, gee, they had some type of hearsay, absolutely uncooperated individual suspicion. But at the same time, they want to say he volunteered. He volunteered, but I'm going into sentencing entrapment. He volunteered. His bragging was about, one, a burglary of pot. Two, taking a ride with somebody and receiving dope from a gentleman who committed the crime. And ultimately, obtaining drugs by using fake ones. That swindle where it was a stack of money with ones, et cetera, and obtaining money with fake drugs. So, this is going to be a problem in this case, because I don't like to get anyone off. Given the number of issues, the number of defendants, I've got to be tighter on the clock than I normally would be. The red light's on, and you've reserved some time for rebuttal. So, we'll be able to hear from you again. I know we understand government. Speaking only for myself, I find this kind of manufactured criminality incredibly troubling. Also, I'll tell you very candidly, I'm not the least bit sure there's anything we can do about it. Looking at the cases, I just don't. And Judge Santiago mentioned it during the sentencing. He's totally torn by this. He even asked the government, why are you spending resources, basically drumming up criminal activity that probably wouldn't exist but for the inducement offered by the government. I'm just not sure there's any remedy. And that goes, I think, both, the Hobbs Act thing has gone because of Zanotti. And I know you've got to protect the record, but Zanotti's clear there's no Hobbs Act issue here. There's no jurisdictional issue, unless I'm missing something. So, it all seems to blend into a kind of a due process sentencing entrapment thing that we can talk more about. I'm just trying to narrow down the argument a little bit so we can kind of stick within our time parameter. You know, all that to say, I'm sympathetic to you, but I'm not one of the men in D.C. And I'm not one of the hundred in the Senate. I'm not sure it's going to get you anywhere. If not now, Judge, when? At some point, we've got to address the racially discriminatory targeting and the outrageousness of the government's participation and, in fact, inducements here. I mean, this is almost a million dollars worth of drugs. We do get it. Yeah. Thank you, Your Honor. I'll be back. Okay. That sounded like a threat. Good morning, Your Honor. Lawrence Narcissi on behalf of Mr. Tallis. Your Honor, before I begin my argument today, I would like to respond. I'm going to take this being recorded. I'm sorry. I'm going to put the mic aside. We won't be able to get you to provide it. That's because we have enough volume, but I understand.  the United States government and its taxpayers approximately $1.5 billion. to house an inmate. With that said, as far as Mr. Thompson is concerned, the government is looking at a $5.8 million tab for the period of his incarceration. He received a sentence of 252 months. With that said, Your Honors, I'm going to continue my argument as far as the Senate is concerned. But that's something you can take up with Loretta Lynch. I mean, that's not anything we can do much about. Your Honor, I understand, but just as to the waiver issue, Judge Smith had raised that     ask the court to consider that and then multiply that number by each other. With that said, though, as far as the entrapment and the manipulation issues, Your Honor, early on, Judge Rehnquist, in an opinion that he subsequently tried to get away from, discussed the fact that, if not now, when there may be a time when governmental conduct may reach such a level as to warrant the consideration or addressing the entrapment offense. That was in 1978. As we stand here 38 days later, I'm going to ask the court to consider that. The issues as far as what we're looking at here, I understand, of course, that the    that and then multiply that number by each other. But when this case came out, there was... Are you addressing the quantity issue or the racial issue? Your Honor, I'm going to address quantity. All right, but here's the tough question, I think, on quantity. If we're dealing with corner dealing, I think you've got a lot more room to argue that they trumped up the quantity. But if you or I were to conjure a stash house robbery, I think you'd have a lot more room to argue that it's not much of a stash house if it doesn't have multiple kilos of cocaine. Correct? Your Honor, I agree with you. So don't we need, then, a black-letter rule, if you're to prevail here, that says the fake stash house robbery sting is invalid as a category? Because if we allow the category to be valid in some way, shape, or form, then it seems to necessarily follow that 5, 10, 15 kilos to maybe 20 is de rigueur. Your Honor, I understand the court's concerns in this regard, but here's a couple of issues. One, I think when you're manufacturing, the issue as far as the 10 kilos is concerned, the courts are obviously aware of the fact that the mandatories that are being triggered. That's one of the problems. But I'd raise the court to consider an even broader analysis here. Because part of the fiction the government presented at trial in this case was the fact that there was also an AK-47 here. And essentially what the government is doing now, if you think about this, they're rolling the two together. Not only do you have the entrapment as to weight, but now you have the entrapment as to the firearms as well. But again, it's not much of a stash house if it's not protected with firearms, is it? You know what, Your Honor? I guess what I'm challenging with Mr. Narcisi is, if this agent had gone to Quasi, or the other gentleman that got caught up in this, and said, hey, I've got this slick, you know, oh, what is it? Well, it's a couple of nine balls, and there's a guy with an AK-47. He's got a BB gun guarding the house. Would he not immediately expose himself as someone who didn't know what in the world he was talking about? Your Honor, I understand that. But at this juncture, when you consider that we're dealing with the targeting of a very economically depressed area of the city. All right. Let's talk about the racial issue. I mean, isn't that a possibility? You could prove up the racial case. But you've got to do it by bringing forward some evidence of non-African Americans who are engaged in like behavior, who are getting a pass for this. I understand. You could prove up. I'm not saying you failed here, but there could be a case where that's proved up. I understand the Court's reference to Armstrong in that matter. And, Your Honor, there's been some kind of tough burden. Pretty tough burden, though, isn't it? It's an impossible burden. Is it even possible? You know what, Judge? My wife has me doing a lot of work at the house. This is even more than she's making me do. I'm just glad there's more than one of us here. Thank you. It is an impossible burden. But that's why I said, Your Honor. As in D.C. I would submit to Your Honor, that's the second legal fiction here as far as this case is concerned, separate and apart from the issues regarding the 10 kilos. All right. Hal, if the case has been handed down, is the Court now willing to say that it is incumbent on every defense attorney to question the underlying national policy determinations regarding any law enforcement practice? Well, the Armstrong doesn't go that far. It sets out a burden that one has to get past, which I do think is totally insurmountable. We can't do it. Then, Your Honor, then... Then we can't change what's been quite said. You basically need a cooperating witness from the other team, right? Many of them. You need some agents out there that say, look, we've been working this and we have evidence that it's getting squashed. Your Honor, you know what? We filed the motion. We asked for discovery. It was limited. It was tailored. We parodied the language that the District Court in Illinois had acknowledged and allowed discovery on that issue. All right. Judge Sanchez addressed that issue and denied the motion, following the language in Armstrong. I understand his reasoning and his rationale. There's no argument there. But that's part of the problem.  running into a wall, Judge. And that's part of the problem here. Why even have the mechanism? Just simply say, you know what? No. Government misconduct is not an issue as far as entrapment is concerned. And leave it at that. It would be a little bit more simple in terms of judicial economy and allocation of judicial resources. When you're giving us something that doesn't exist, then what are you giving us? If you're giving us this Armstrong standard, which is ridiculous... We didn't agree to that. I'm kidding. She keeps trying to promote us. I know. Well, you know what, Judge? I heard there's an opening. But with that said, Your Honor, what do we have here? And so now, like, back to the entrapment aspects and the manipulation aspects. When you have a situation where the determination... And, Judge, I understand your concerns. You know what? You've got to bait the trap to catch a rat.   To what extent, when you are giving us this Armstrong standard, when you're giving us this, when you are preying on a very narrow portion of the community, when you're preying on citizens who are in a very dire situation otherwise, young guys with kids who are trying to do the right thing otherwise, how much cheese do you have to put into the trap to get the mouse that you're looking for? There are cases that are out there talking about the need to use this kind of law enforcement tactic or technique. And I think the courts need to consider that.  But what I'm saying is that this is an AK-47 with 10-key argument. You know what? We have a situation where the agents, the cooperating agent testified that he was just simply a courier and he was bringing the gas. No, he was not. Why isn't the do they need to not a classic question of policy and prosecutorial discretion? And how is that not asking us to enter the area of prosecutorial discretion? Your Honor, I'm not. What we need to do is draw a line as far as what prosecutorial discretion, how far can prosecutorial discretion go? Are there limits to prosecutorial discretion, Your Honor? Or is it simply fiat? I would suggest to the court that that's not the case. And in this particular situation, what are the limits in terms of what prosecutorial conduct or discretion goes to? At what point do you say enough is enough? I'm sorry. Enough is enough. Thank you. Thank you. Good morning, Your Honors. Good morning. Ray Roberts, I represent Mr. Kareem Long. And I would like to reserve one minute for rebuttal, if I might. Your Honor, basically, I'm here to argue about the 404B issue. Judge Sanchez let in information regarding a prior bad act that my client supposedly was involved in. There's no proof of it, basically, other than the word of a cooperator by the name of Lafayette Rawls. I basically argued in my opening that my client, for the first time in my life, was involved in a bad act. And that he, for the first time, heard about this alleged lick the night before it was supposed to happen, or the night before they went to the hotel. And that at the time he heard it, and at the time he got to the hotel the next day, there's no real indication that he had decided to get involved in it. Could I ask you, just to back up a little bit, and for clarity, which perhaps my colleagues don't need, but I would like to refresh my own recollection, just how this 404B was made. As I recall, the government came forward prior to trial with a request, and did the district court at that time deny the request and allow the government to renew it? He called it a pretty close call at that time, didn't he? The language the court used was, the court finds the probative value of the evidence on these issues is substantially outweighed by the danger of unfair conviction. So what is the evidence, first of all? What did the government want to get in? During a proffer session, Mr. Rawls, a cooperator, told Agent Hennigan that my client had come to him at some point weeks before and said that he had done robbery. And supposedly, and as you look through the transcript and read through my issue one, there's a question as to whether or not there were drugs involved in the robbery or not. And of course, there's a question as to whether or not Mr. Rawls was telling the truth. But that's how it came about. And the government represented that basically that Mr. Rawls had first-hand knowledge that the defendant had done this robbery. And based on the government's representation, Judge Sanchez made his ruling. Chief, could I pursue this for just a minute? Go ahead. So what was the government proffering this evidence for? That is, as relevant to what under 404B? To me, the capacity. Well, I understand that's your position. But explicitly, they invoked something under the rule. Intent. Intent. And the judge so found, right? Did not the judge find that in your opening you put intent at issue? That's what he found. And why was that wrong? Because I didn't put intent at issue. What I said was that at the time the defendant reached the yard, and at the time he talked to Lafayette Rawls the night before, and even Rawls says he never told the defendant what it was about, what the whole thing was about. He was with his mother and his girlfriend the night before when he saw the defendant. And he said, hey, listen, there may be an opportunity or a lick the next day. If you want to hear about it, give me a call. We'll go to the lot the next day. So was there some significance in the use of the term lick in this conversation with respect to the prior act? I won't say there is, but lick could mean anything. It could mean a lot of things. It doesn't mean a stash house robbery. That's your point. Absolutely. It could mean all kinds of things. It could mean a hundred different things. So why wouldn't it come in to show the association? I am really on the... Because this incident that occurred had nothing to do with the supposed incident regarding the special agent. It had nothing to do with it. It was something that he claims that he said to the defendant. He didn't even tell the defendant. He admitted he had nothing for the defendant. He said, why don't you go see someone named Kennard. So he doesn't hear anything else from the defendant. As a matter of fact, Rawls disavows having any knowledge of anything. Other than supposedly the defendant coming back and saying to him, I did something and I got some money. So they had nothing to do with each other. Absolutely nothing. Did you reserve any time? I did reserve a minute. Okay, okay. Thank you. I'm glad you're giving this case more time. Good morning, Your Honor. My name is Steven Petrizio. I represent Kenneth Pornel. If I could reserve a minute or two. Which is? I'll take one. All right. Okay. So Judge McKee, when you, or Chief Judge McKee, when you made your statement, I looked up here and saw that you are the guardians of liberty. And I'm going to suggest a couple of things. You saw that in there? Yes. I guess I never read that before. Neither did I. But when you were saying you're sympathetic, but there's not much you can do, I'd first like to say Gennady does not control here. I'm going to suggest he does not control because that was under color of law, that this fabrication goes not parallel. No, you're not confusing Gennady with Manzo. Manzo was under color of law. Manzo was under color of law. And your argument seems to be that Manzo tacitly overruled Gennady, which can't be the case because Gennady was the court speaking and bank, right? I'm just going to suggest with the bold statement that Gennady is different than this set of facts in this case. Well, the Arab Sheikh attempt was no less fantastic than this Stashev's robbery, wasn't it? But they targeted an appropriate group to target under the Hobbes Act, under the law. But it's Councilman from Phoenix, I don't see it. People who would be in a position to accept bribes. My client in this particular case, and I'm not going to try to distinguish, came in on the last day. Importantly, the government, the way they wrote their brief with such a broad brush, there were eight people who were recruited when if you look at the evidence, the entire record, the suggestion was that no more than two or three people were going to be a participant in that. So then you have... See, but that kind of hurts you because people are sort of coming out of the woodwork, taking me, taking me, I can do it, taking me and that and that. I'm not sure that helps you. I believe that it does, Your Honor, in terms of demonstrating the outrageousness of what was done here. You hit the nail on the head by beginning, the person that they were going after was not even at the door. Then Whitfield then recruits other people and the situation just goes downhill. Judge, the other thing I want to suggest is that there is a jurisdictional issue. That relief can be granted here because of the erosion of the Commerce Clause. And if you look at this record, Judge, this is not a drug trafficking case. It is not. In terms of sentencing, there is a whole lot you can do. You can suggest a new sentencing under different powers that I addressed in my brief, but more importantly, a departure. Well, you got, well, I just spent all day reading Whitfield's sentencing transcript. I did not read your client's, but I'm assuming Judge Sanchez was as troubled when it came to sentencing. Absolutely, Judge, but again, my client had nothing in his background and also gave him a two-level enhancement because he testified. Well, it wasn't just because he testified. Well, he testified that he was not a willing participant. It was something to do with race. Was it your client who made the comment in the jail about the address? Judge, that went absolutely nowhere in terms of the threat concerning Mr. Reynolds. Well, let me just get an answer to the question first. Was that your client or one of the other? Yes, you are correct. All right. Well, the claim was that your client blurted out the address of one of the cooperating witnesses. Are you arguing that it was not within the province of the district judge to deem that to be intimidation? He did have that problem. Okay. I was speaking more to his testimony in terms of the enhancement. But putting that aside, the sentences that these young men received, again, if you put the whole process together from start to finish, this was not a drug transaction case. Although the government makes that argument at different times, it's inconsistent because the overwhelming testimony from the government witnesses was that the pay for the stash house, for robbing the stash house, was that somebody or individuals were going to get a brick or a kilo of cocaine. The government argues at one point that there was going to be a cooperative distribution or selling of the cocaine. They cannot have it both ways. So that sentencing could have been under what was the alleged violent action concerning the stash house robbery. The drug distribution was something I suggest totally collateral and, again, not their theory of their case, although they speak out of both sides of their mouth when that does, in fact, happen. So, Judge, I suggest that if you want to begin to actually look at this case, I would suggest a couple of things, that the Gonzalez case, the concurrence of the late Judge Scalia, and the dissent in Thomas, talks about the aspects of the erosion of the Commerce Clause that will allow the intent of the... You're talking about the Raich, Gonzalez v. Raich? Yes. We've clearly argued on that issue. Well, they lost there, right? They did. That's part of the problem. They did, but you asked Mr. Farrell what can be done. You gentlemen have the opportunity to begin to retrench what is really a tyrannical aspect, an overreach of this type of operation. Your words were, you're sympathetic, but what can be done? I think that there are things that you have the power to do in terms of due process itself. In terms of sentencing. In terms of separation of powers with respect to what they did here. Somebody was convicted under a mandatory minimum statute, though. The sentencing judge has to comply with the mandatory minimum statute. Again, Judge Jones says... The judge could have departed. The judge is not happy with what he or she has to do. That's kind of the face kill. I'm suggesting the judge could have engaged in a departure. Yeah, but that's something I'm troubled by, honestly. Because it's not done. Well, I mean, if a district judge is troubled... I mean, we were all trial judges, I guess. I mean, I remember variances where a guy's looking at a big number, and you realize he's just sort of a patsy in the grand scheme of things, and you do a substantial variance. So what is an appellate court like ours to do with trial judges who say one thing and do another? In other words, well, I'm really troubled by this, but boy, I'm still going to whack him. You can revoke the sentencing, giving Judge Sanchez the right to consider a departure. Is there anything in our jurisprudence that would suggest that we can do that absent a determination that the judge misunderstood his authority to do such a thing? I don't think there is. He clearly did not misunderstand his authority. I think you can do it under due process grounds. That's my belief. Okay. Thank you, Judge. Thank you, Judge. If Your Honor's please, I'm Eric Henson. I represent the United States. I'll begin where the arguments began with the outrageous government conduct claim, which was waived and properly held by Judge Sanchez to have been waived. Given the standard for outrageous government misconduct, which is conduct that is so outrageous that it shocks the universal conscience and is clearly intolerable, the idea that they had to wait until not the, they confused the discovery issue on racial profiling with outrageous conduct. They waited until they had this Hudson decision from California, which was later reversed. The reason they didn't think of this is there was nothing outrageous here. The conduct here was a standard type of sting operation. The problem may be, from their perspective, that it is so standard. That might be part of the problem. By standard, I mean it was conducted in accordance with principles that have been worked out following, for example, Gennady and other sting operations. There simply was nothing outrageous, which is why the claim was raised. Instead, the defense got on a bandwagon later claiming that there was something outrageous that they couldn't perceive. Because of what happened in Chicago? Because of the publicity that occurred? Exactly. Judge Sanchez properly held that argument to have been waived. In any case, it is a make-wait. None of the appellate courts that have addressed the arguments have found outrageous government misconduct. The dissenters from those cases have suggested that the defendant should be permitted to plead an entrapment defense. In our case, Whitfield did plead an entrapment defense. Judge Sanchez gave it to the jury and the jury rejected it. The remaining defendants were not recruited by the government in any way and they had no entrapment defense, much less an outrageous conduct defense. With respect to the sentencing entrapment... Before you get there, could you address the evidentiary issue, the 404B issue? You're familiar with our decision in Caldwell just from a couple years ago. Yes, Sean, I am. One of the things that surprised me about your brief is I don't recall that you addressed the issue of harmless error. And... I noticed that as well. It might have been important to do that because as we've said in Ray 404B, the burden is on the proponent to construct quote, a logical chain that connects the evidence to a proper purpose, no link of which is forbidden propensity inference. End quote. Why wasn't this violative of... I'm talking about the evidence that Mr. Roberts adverted to. Why wasn't that violative of that rule? It was not violative because the government before trial proffered the evidence for two purposes. Intent, which it anticipated would be disputed and the association of the parties. That is, Rawls who recruited Long, the explanation for that recruitment was that he knew that Long would agree to help out because Long had previously done a lick. Done a lick. Alright, but... Which also... We cannot infer, can we, from that that the previous lick involved anything like a 10 kilo stash house robbery? It could have involved multifarious crimes. The... The lick, though, was the forcible taking of controlled substances. In any case, it explained what lick meant. It explained intent neither with any idea of propensity. But that... That... Intent is a ambiguous and I think he starts saying it comes in for intent. And then he says, well, why does the prior crime show he intended this crime? The obvious answer is, well, the prior crime shows he intended this crime because he did... He's that kind of guy. To me, if you're going to do it for intent, there's a very, very fine universe of prior bad acts that... that probably fit under 404B, intent. But just to say he did something bad before and therefore he intended it this time strikes me as exactly the kind of propensity evidence that 404B includes. The... The prior robbery lick was something that he had declared his intent to engage in and then confirmed that he had in fact done so. So it was a previous declaration of intent. There was nothing about that that had to do  propensity. Why wouldn't the prior declaration of intent be propensity? This is not... He showed up today not by happenstance or accident. He did it because we know he does this kind of stuff. He did it before he showed up to do it again this time. Why isn't that exactly propensity evidence? The intent is what shows the propensity. That would have been a misuse of the evidence and the government didn't offer it for that inference.  were two purposes, neither of which did Judge Sanchez find lacked the chain of inference required. He excluded the evidence. Preliminarily, he certainly signaled that he had a difficulty with it. It was under 403. That is, it was more prejudicial than probative. He did not ultimately engage in specific analysis under 403 when he let the evidence in, did he? He had said earlier, and I think implicit in his ruling, was that if this any 403 analysis depends on the issues at the trial. I think it is clear that his ruling with respect to this evidence was announced beforehand. I will reconsider this if you make it relevant, which Mr. the defense did. Mr. Hanson, you have been around a long time. I have been around a long time. We have known each other for a lot of years. You might have even seen this guy. He knows me from before. I was a slim man. I    a long time. I have been around a long time. In any event, we have all seen the use of 404B evidence frequently. This court has struggled with some of these issues in trying to get prosecutors and district courts to make better records. In fact, you noted in a footnote in the government's brief what you perceived as something of a shift in our jurisprudence. I don't quite see it that way. I see it more as a matter of emphasis. The fact that we are talking right now about lack of clarity in the proceeding process by this district judge just suggests that somehow this isn't getting through. Isn't there a duty on the part of a prosecutor where the record hasn't been made as clearly as it ought to be to push the district judge to do that? Judge Hardeman pointed out something that bothered me right away when I read the briefs and that was the failure by the government to engage in a harmless error analysis in the brief. This all helps us if the prosecutor at trial, and of course I'm talking about the trial folks here, not you folks at the appellate level, but this would be enormously helpful. I have been in that trial position. I know you have. Judge McKee and I have had some debates over my conduct of a trial and the manner in which I articulated the government's support for a ruling by the trial judge. We did not perceive that this was a close question. Therefore, we didn't argue harmless error. The long having previously declared his understanding what a lick was and his willingness to participate, having been invited by Rawls, then unequivocally and repeatedly stated his understanding of what was proposed, refused an offer to withdraw from it, and therefore, and with the court's permission, I will submit briefly the argument that I'm making now that were there error, which we don't believe there was, even taking into account which we try faithfully to do, this court's admonitions that we do not make adequate records, and understanding that it is an obligation of the parties to set the record and make it clear that what they would rule were wrong to make that conversation, those previous conversations all the more relevant, and that affected not his view on whether it was propensity evidence at all, but on his balance, because the balance has to be struck in light of the defense. If it was invalid propensity evidence, why was that error harmless? Because the evidence was not at all necessary to prove intent which was established unequivocally if he had no intent the night before, and he had no intent when he reached the meeting, he declared his intent during that meeting, and was given an opportunity to say, well, if this isn't what you want to get involved in, you're out of it, and continued on. But is it the danger, Mr. Henson, that the mere reference to a prior conviction or a prior criminal act by the defendant who is on trial in and of itself carries a certain measure of a program that will be taken by a jury that will cause them to look at this defendant in a completely different light irrespective of certain other evidence that's in the case? That is a possibility, and that's why this court, this court's committee, with this court's approval, have obligated instructions on how the jury should use the evidence, that this evidence is offered for a limited purpose. That is where the danger, which is the reason why this is to be litigated, if possible, before trial and then litigated during trial with appropriate explanation. The danger of unfair prejudice is disarmed by the instruction which is required to be given when the evidence comes in for a non-propensity purpose, which it did here in two ways, for intent and for the association to explain Rawls' relationship with Long. And there's nothing about Caldwell or Brown or any of the other opinions of this court with respect to this type of evidence that suggests that when a co-operator is testifying about his relationship with a co-conspirator, he may not testify about what that relationship was to explain what would be otherwise mysterious. Why did he call Long? And in the context of the defense that was offered, it's hard to see that a mystery on that point would have been more prejudicial than the appropriately properly admitted evidence, which was explained to the jury, was offered for a limited purpose. So with your Honor's permission, I will, with Chief Judge McKee's permission, I'll submit a brief statement of what I know about   I will submit    of what I know about the case. I will submit a brief statement statement of what I         brief statement of what of what I know  the case. I will